**POMERANTZ LLP**
J. Alexander Hood II
600 Third Avenue
New York, New York 10016
Telephone: (212) 661-1100
Facsimile: (212) 661-8665
ahood@pomlaw.com

*Counsel for Plaintiff*

*[Additional Counsel on Signature Page]*

UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF NEW YORK

| | |
|---|---|
| MARK BRENNAN, Individually and on behalf of all others similarly situated,<br><br>Plaintiff,<br><br>v.<br><br>HYZON MOTORS INC. f/k/a DECARBONIZATION PLUS ACQUISITION CORPORATION, ERIK ANDERSON, PETER HASKOPOULOS, CRAIG KNIGHT, and MARK GORDON,<br><br>Defendants. | Case No.<br><br>CLASS ACTION COMPLAINT FOR VIOLATION OF THE FEDERAL SECURITIES LAWS<br><br><u>JURY TRIAL DEMANDED</u><br><br><u>CLASS ACTION</u> |

Plaintiff Mark Brennan ("Plaintiff"), individually and on behalf of all other persons similarly situated, by Plaintiff's undersigned attorneys, alleges the following based upon personal knowledge as to Plaintiff and Plaintiff's own acts, and upon information and belief as to all other matters based on the investigation conducted by and through Plaintiff's attorneys, which included, among other things, a review of U.S. Securities and Exchange Commission ("SEC") filings by Hyzon Motors Inc. f/k/a Decarbonization Plus Acquisition Corporation ("Hyzon" or the "Company"), as well as media and analyst reports about the Company and Company press releases. Plaintiff believes that substantial additional evidentiary support will exist for the allegations set forth herein.

1

**NATURE OF THE ACTION**

1.      This is a federal securities class action on behalf of a class consisting of all persons and entities other than Defendants (defined below) who purchased or otherwise acquired the publicly traded securities of Hyzon between February 9, 2021 and September 27, 2021, both dates inclusive (the "Class Period").  Plaintiff seeks to recover compensable damages caused by Defendants' violations of the federal securities laws and to pursue remedies under Sections 10(b) and 20(a) of the Securities Exchange Act of 1934 (the "Exchange Act") and Rule 10b-5 promulgated thereunder.

**JURISDICTION AND VENUE**

2.      The claims asserted herein arise under and pursuant to §§10(b) and 20(a) of the Exchange Act (15 U.S.C. §§78j(b) and §78t(a)) and Rule 10b-5 promulgated thereunder by the SEC (17 C.F.R. §240.10b-5).

3.      This Court has jurisdiction over the subject matter of this action under 28 U.S.C. §1331 and §27 of the Exchange Act.

4.      Venue is proper in this judicial district pursuant to §27 of the Exchange Act (15 U.S.C. §78aa) and 28 U.S.C. §1391(b) as the alleged misstatements entered and subsequent damages took place within this judicial district.  The Company also maintains its principal executive offices in this District.

5.      In connection with the acts, conduct and other wrongs alleged in this Complaint, Defendants, directly or indirectly, used the means and instrumentalities of interstate commerce, including but not limited to, the United States mail, interstate telephone communications and the facilities of the national securities exchange.

## PARTIES

6.      Plaintiff, as set forth in the accompanying Certification, purchased the Company's securities at artificially inflated prices during the Class Period and was damaged upon the revelation of the alleged corrective disclosure.

7.      Defendant Hyzon purports to be a leader in fuel cell electric mobility with an exclusive focus on the commercial vehicle market, and a near-term focus on back to base (captive fleet) operations.

8.      Defendant Hyzon is incorporated in Delaware and maintains its principal executive offices at 475 Quaker Meeting House Road, Honeoye Falls, NY.  On July 16, 2021, the merger between Decarbonization Plus Acquisition Corporation and Hyzon Motors USA Inc. f/k/a Hyzon Motors Inc. ("Hyzon Motors USA") closed.  On that date, Decarbonization Plus Acquisition Corporation changed its name to Hyzon Motors Inc. and on July 19, 2021, Hyzon common stock began trading on NASDAQ under the ticker symbol "HYZN" and Hyzon warrants under the ticker symbol "HYZNW."  Before the merger, the Company's securities traded on NASDAQ under the ticker symbols "DCRBU" for Units[1], "DCRB" for common stock, and "DCRBW" for warrants.

9.      Defendant Erik Anderson ("Anderson") served as the Company's President and Chief Executive Officer ("CEO") throughout the Class Period until the July 2021 merger. Defendant Anderson is a member of the Company's Board of Directors.

10.      Defendant Peter Haskopoulos ("Haskopoulos") served as the Company's Chief Financial Officer ("CFO") throughout the Class Period until the July 2021 merger.

11.      Defendant Craig Knight ("Knight") has served as the Company's CEO since the July 2021 merger and is a co-founder of Hyzon Motors USA where he served as CEO from

---

[1] 1 Company Units automatically separated into the component securities (common stock and warrants) at the time of the July 2021 merger.

August 2020 until the July 2021 merger.  Defendant Knight is a member of the Company's Board of Directors.

12.     Defendant Mark Gordon ("Gordon") has served as the Company's CFO since the July 2021 merger and served as Hyzon Motors USA's CFO from August 2020 until the July 2021 merger.  Defendant Gordon is a member of the Company's Board of Directors.

13.     Defendants Anderson, Haskopoulos, Knight, and Gordon are collectively referred to herein as the "Individual Defendants."

14.     Each of the Individual Defendants:

(a)     directly participated in the management of the Company;

(b)     was directly involved in the day-to-day operations of the Company at the highest levels;

(c)     was privy to confidential proprietary information concerning the Company and its business and operations;

(d)     was directly or indirectly involved in drafting, producing, reviewing and/or disseminating the false and misleading statements and information alleged herein;

(e)     was directly or indirectly involved in the oversight or implementation of the Company's internal controls;

(f)     was aware of or recklessly disregarded the fact that the false and misleading statements were being issued concerning the Company; and/or

(g)     approved or ratified these statements in violation of the federal securities laws.

15.     The Company is liable for the acts of the Individual Defendants and its employees under the doctrine of *respondent superior* and common law principles of agency because all of the wrongful acts complained of herein were carried out within the scope of their employment.

16.     The scienter of the Individual Defendants and other employees and agents of the Company is similarly imputed to the Company under *respondeat superior* and agency principles.

17.     The Company and the Individual Defendants are referred to herein, collectively, as the "Defendants."

## SUBSTANTIVE ALLEGATIONS
## Materially False and Misleading Statements

18.     On February 9, 2021, the Company issued or caused to be issued a press release entitled "Hyzon Motors, the Leading Hydrogen Fuel Cell Heavy Vehicle Company, Announces Business Combination with Decarbonization Plus Acquisition Corporation; Combined Company Expected to be Listed on Nasdaq" (the "February Press Release") which stated the following, in pertinent part, touting Hyzon's (then called "Hyzon Motor Inc.", "Hyzon Motors", or "Hyzon") deals and delivery schedule:

- Proceeds to fully fund and ***accelerate Hyzon's well-defined growth strategy in the hydrogen fuel cell-powered, zero-emission commercial transportation sector***

- ***Hyzon's technology already commercialized with existing global footprint, and sales pipeline with blue-chip Fortune 100s and municipalities*** ...

Hyzon Motors Inc. ("Hyzon" or "the Company"), the industry-leading global supplier of zero-emissions hydrogen fuel cell powered commercial vehicles, and Decarbonization Plus Acquisition Corporation ("DCRB") (NASDAQ: DCRB) today announced a definitive agreement for a business combination that would result in Hyzon becoming a publicly listed company.

Hyzon, headquartered in Rochester, New York, is a differentiated, pure-play, independent mobility company with an exclusive focus on hydrogen in the commercial vehicle market. The Company's proven and proprietary hydrogen fuel cell technology enables zero emission, fleet based, commercial transport at competitive performance as measured against both traditional fuel sources and other alternative vehicle power sources. Through its partnerships with market-leading suppliers and manufacturers, and the Company's commercial relationships with retailers, consumer goods companies, natural resource firms and governments, ***Hyzon has rapidly expanded its commercial reach with supply agreements to customers around the world***. With a demonstrated technology advantage, leading fuel cell performance and a history of rapid innovation, Hyzon is catalyzing the adoption of hydrogen heavy vehicles.

Craig Knight, Chief Executive Officer and Co-Founder of Hyzon, said, "We are excited to partner with DCRB at an important inflection point for our company, hydrogen and society. ***Deliveries of Hyzon fuel cell powered heavy trucks to customers in Europe and North America will occur this year, well ahead of our competitors, and our committed sales pipeline is proof that the world is truly recognizing the need to develop innovative solutions to mitigate climate change and accelerate efforts to move the world economy down the path to net-zero emissions.***"

George Gu, Chairman and Co-Founder of Hyzon remarked, "***This business combination will enable us to expand deployments of our zero-emission hydrogen fuel cell powered heavy vehicles globally, and to continue leading the hydrogen transition.*** We are incredibly excited about the dynamic mobility category as municipalities and ***Fortune 100 companies are rapidly embracing hydrogen as the essential pathway to a net-zero economy***. The number of countries cementing and then enhancing their national hydrogen strategies expands almost weekly, and ***we are extremely encouraged by both investor and public interest in the hydrogen economy***"

Robert Tichio, Chairman of the Board of DCRB and a Partner at Riverstone Holdings LLC, said, "... When forming this investment vehicle our objective was clear: to identify a truly exceptional company that is decarbonizing the global economy, ***disrupting an established industry with the commercialization of innovative technologies***, and is well aligned with ESG principles. We found that company in Hyzon."

(Emphasis added.)

19.     Also on February 9, 2021, the Company filed a Form 8-K, signed by Defendant Haskopoulos, with the SEC announcing the merger plan that attached the February Press Release.  This Form 8-K also attached an investor presentation by Hyzon which touted its "Top Tier Customers/End Users/Partners", "Customer Deployments", and "Vehicle Customers" in the following slides:

## Investment Overview



| Select Thesis Highlights | |
|---|---|

- Hyzon provides equity investors with **the only pure-play, independent hydrogen mobility company** targeting the Commercial Vehicle and Heavy Duty transportation segments
- **2021 backlog of ~$40 million under contract or MOU** from blue-chip Fortune 100s and municipalities with exceptional (and rapidly growing) 2022+ visibility
- Revenues rooted in sales to customers with **existing and secured hydrogen production / supply** – hydrogen infrastructure investments will be opportunistic, with recurring revenue potential
- 80% of near-term backlog to customers in **Europe, Asia and Australia**
- Existing **global footprint with 200,000 square feet of facilities** in New York and The Netherlands (including Hyzon Engineering Center established in the former GM Fuel Cell facility in Honeoye Falls, New York)
- Captive, proven fuel cell technology with superior competitive performance against other fuel cell products; Hyzon will **produce its own fuel cells**
- **Experienced fuel cell and automotive sector management team**
- 100% of existing investors, including Total and Piëch-Nordhoff family (Porsche family office), to roll equity, with **no secondary proceeds**

## Customer Deployments Underway and Demand is Accelerating Rapidly

Vehicles ordered and near-term pipeline – the future is *now*





20.    On March 1, 2021, the Company filed an Annual Report for the year ended December 31, 2020 on a Form 10-K with the SEC (the "2020 Annual Report").  The 2020 Annual Report was signed by Defendants Anderson and Haskopoulos.  Attached to the 2020 Annual Report were certifications pursuant to the Sarbanes-Oxley Act of 2002 ("SOX") signed by Defendants Anderson and Haskopoulos attesting to the accuracy of the financial statements and the disclosure of all fraud.  The 2020 Annual Report referenced and referred investors to "the Form 8-K filed with the SEC on February 9, 2021 for additional information" regarding the merger.

21.    On May 13, 2021, the Company filed an amendment to the 2020 Annual Report on a Form 10-K/A with the SEC that was signed by Defendants Anderson and Haskopoulos and referenced and referred investors to "the Form 8-K filed with the SEC on February 9, 2021 for additional information" regarding the merger.  Attached to the Form 10-K/A were SOX certifications signed by Defendants Anderson and Haskopoulos attesting to the accuracy of the financial statements and the disclosure of all fraud.

8

22.     On May 24, 2021, the Company filed a Quarterly Report for the quarter ended March 31, 2021 on Form 10-Q with the SEC (the "1Q21 Report").  The 1Q21 Report was signed by Defendant Anderson.   Attached to the 1Q21 Report were SOX certifications signed by Defendants Anderson and Haskopoulos attesting to the accuracy of the financial statements and the disclosure of all fraud.  The 1Q21 Report referenced and referred investors to "the Form 8-K filed with the SEC on February 9, 2021 for additional information" regarding the merger.

23.     On June 21, 2021, the Company filed with the SEC a Proxy Statement on Schedule 14A (the "Proxy Statement") which stated the following, in pertinent part, regarding Hyzon's deals and delivery schedule:

> **_Initial deliveries of Hyzon-branded commercial vehicles are expected this year._**
>
> *        *        *
>
> To date, Hyzon has received orders for Hyzon-branded commercial vehicles and coach buses in an aggregate value of approximately $18.2 million from companies around the world, including Fortescue Metals Group Ltd., and Hyzon's counterparties have paid $1.8 million in deposits in respect of such orders. Hyzon also has an order valued at $1.47 million to integrate a hydrogen fuel cell system built around its next generation fuel cell stacks into aircraft, in respect of which Hyzon's counterparty has paid a deposit of $0.7 million. Hyzon's orders each include terms permitting the counterparty to cancel or suspend some or all of their obligations thereunder without cause, with little or no prior notice and without penalty or early termination payments. However, **_Hyzon currently expects that these orders will be fulfilled_** and has determined that each a contract with a customer exists in accordance with ASC 606-10-25-1. The transaction price associated with the subset of these contracts entered into prior to December 31, 2020 has accordingly been disclosed as a remaining performance obligation pursuant to ASC 606-10-50-13 through 50-15 (refer to Note 3: Revenues, within the Notes to Hyzon's Consolidated Financial Statements).
>
> * * *
>
> *Timeline*
>
> In Europe, Hyzon commenced assembling commercial vehicles in its Winschoten facility in February 2021, and **_most current European and Australia/New Zealand commercial vehicle sales are expected to be fulfilled by the Winschoten facility, with first deliveries targeted for the second quarter of 2021_**.

(Emphasis added.) (Internal footnote omitted.)

24.     On July 22, 2021, the Company filed a Form 8-K, signed by Defendant Knight announcing the closing of the merger, and incorporated the Proxy Statement by reference and referral.

25.     On August 11, 2021, the Company issued a press release entitled "Hyzon Motors Announces Second Quarter 2021 Financial Results" which stated that "Hyzon reaffirms 2021 sales outlook, *including 85 vehicles to be shipped worldwide*[.]" (Emphasis added.)

26.     On September 9, 2021, the Company issued a press release entitled "Hyzon Motors to supply up to 500 hydrogen fuel cell electric vehicles to Shanghai logistics company" which stated the following, in pertinent part, regarding the Company's deals and delivery schedule:

> ...*the initial order of 100 vehicles is expected before the end of 2021* while the other 400 vehicles will be ordered in 2022.
>
> HongYun Automobile focuses on providing logistics solutions primarily through hydrogen-powered fuel cell electric vehicles. *The company provides operation, leasing and maintenance service for customers across the country, including one of the world's largest steelmakers.* After Hyzon delivers the vehicles, HongYun will be responsible for the subsequent commercial arrangements with its end customers.
>
> *"Hydrogen fuel cell technology has been adopted more quickly in China than in the rest of the world," said Hyzon CEO Craig Knight.* "This allows Hyzon to begin the critical work of decarbonizing the environment, while building experience, capacity, and expertise which will be applied globally."

(Emphasis added.)

27.     The statements referenced in ¶¶18-26 above were materially false and/or misleading because they misrepresented and failed to disclose the following adverse facts pertaining to the Company's business, operational and financial results, which were known to Defendants or recklessly disregarded by them.   Specifically, Defendants made false and/or

misleading statements and/or failed to disclose that: (1) Hyzon was misrepresenting the nature of its "customer" contracts and severely embellished its "deals" and "partnerships" with customers; (2) Hyzon could not deliver its announced vehicles in 2021, on its stated timeline; and (3) as a result, Defendants' public statements were materially false and/or misleading at all relevant times.

## The Truth Emerges

28.     On September 28, 2021, market analyst Blue Orca Capital published a report about the Company (the "Blue Orca Report") that, among other things, disclosed the following, in pertinent part, regarding the Company's touted deals:

1. **Hyzon's Largest Customer is a Fake-Looking Chinese Shell Entity Formed 3 Days Before Deal Announced**. We think Hyzon's largest customer looks fake. On September 9, 2021, Hyzon's stock shot up 29% on a pre-market announcement that it secured [link omitted] a major new deal for 500 trucks (including 100 orders in 2021) from a new Chinese customer, Shanghai HongYun. Yet *Chinese government records show that Shanghai HongYun was established only three days before Hyzon announced the deal and has no paid in capital. It has no WeChat account or website.* The supposedly major customer appears to be just an empty shell entity. In our opinion, such evidence suggests that Hyzon announced a major order with a fake looking Chinese customer just to pump its stock price.

2. **Channel Checks Reveal Next Largest Customer Not Really a Customer**. *Hyzon claims that a New Zealand infrastructure startup named Hiringa supposedly signed an agreement to order 1,500 trucks by 2026, purportedly making it Hyzon's next largest customer.* Yet when we channel checked these claims with Hiringa, its executive clarified that *Hiringa was not actually a customer, but a "channel partner" assisting Hyzon in marketing vehicles to real end customers in New Zealand*. Hiringa is a small startup operating out of a house in New Zealand which wants to raise money to build hydrogen fuel stations. Based on our conversation, Hiringa has neither the capability nor the current intention to purchase trucks from Hyzon. ...

3. **Phantom Big-Name Customers Suggest Overstated Orders and Financial Projections**. In its much hyped initial investor presentation [link omitted] filed in February 2021, *Hyzon generated considerable buzz around its SPAC by claiming that big household names -including Coca Cola, Ikea, and Heineken - were already "top tier customers" and "partners."* Yet in the following months, after other EV SPACs like Lordstown Motors got into trouble for fabricating customer contracts, *Hyzon quietly dropped these household names from its investor decks. In the four months between February 2021 and July 2021, nearly all of Hyzon's previously named blue chip customers disappeared*

*from its disclosures altogether. In aggregate, Hyzon dropped customers supposedly accounting for $700 million in future orders from its subsequent decks.* Remarkably however, despite apparently losing many of its most prominent customers, Hyzon's financial projections remained unchanged. We think it's highly misleading for Hyzon to have apparently lost most of its blue-chip customers without substantially revising future revenue projections downward.

- **Former Executives Left in Part Because of Concerns over Misrepresentations on Customer Contracts**. We spoke with one former senior executive who left the Company after only a few months. He said he "didn't like the way [customer contracts] were being presented" and *compared Hyzon "a bit like unfortunately what Nikola was doing... I was very uncomfortable with that."* In our opinion, such accounts corroborate the other evidence showing that Hyzon is likely overstating customer relationships or misrepresenting its contracts. ...

\*\*\*

**6. Two CTO Resignations in 15 Months**. Hyzon is a zero revenue SPAC whose stock price is contingent on the value of its yet undeveloped vehicle technology to generate future revenues. Yet **two of Hyzon's CTOs have resigned in the past 15 months**, even though Hyzon was only formed 20 months ago. The first CTO resigned after just five months at Hyzon. The second, Gary Robb, just resigned (September 2021). If Hyzon's technology is supposedly world class, and the foundation for its hockey stick like future revenue growth, we question why the critical officers in charge of such technology apparently have such little faith in either the Company or the technology (or both) that they stepped down, despite the obvious financial incentives to remain at the SPAC.

Ultimately, we think Hyzon's parent has taken advantage of the general suspension of disbelief in financial markets to enrich insiders by repackaging an old technology in a fig leaf of misleading deal announcements and illusory customer contracts. *In our opinion, it is akin to a Chinese Lordstown Motors.*

**1. Hyzon's Largest Customer is a Fake-Looking Chinese Shell Entity Formed 3 Days Before Deal Announced**.

We think Hyzon's largest customer looks fake. On September 9, 2021, Hyzon's stock shot up 29% largely on the strength of a pre-market announcement by the Company that it had secured a major new vehicle deal.

Hyzon announced [link omitted] that it had signed a Memorandum of Understanding ("MoU") with a new Chinese customer, Shanghai Hydrogen HongYun Automotive Co., Ltd. ("Shanghai HongYun"), for the sale of 500 trucks. *In the announcement, Hyzon claimed that the customer expects to order 100 of these trucks in 2021, with the remaining 400 trucks to be ordered in 2022. This makes Shanghai HongYun by far one of Hyzon's largest near-term customers.*

[Image omitted.]

***To put the size of the order in context, the 100-truck-order supposedly placed in 2021 is larger than the Company's previously guided total deliveries for the year.*** The market duly reacted, causing Hyzon's stock to rip as high as 29% on the day.

***If authentic, Hyzon's deal with Shanghai HongYun is worth as much as $250 million.*** For a commitment of that size, we would typically expect the counterparty to be a deep-pocketed and well-established logistics company with sufficient operating footprint, infrastructure and track record to purchase and deploy 500 new hydrogen fueled trucks.

But when we looked up Shanghai HongYun on China's National Enterprise Credit Information Publicity System, we found that ***Shanghai HongYun was established only three days before Hyzon announced the deal***.

[Image omitted.]

The Chinese corporate registry also shows that Shanghai HongYun has **no paid in capital**.

[Image omitted.]

With no paid in capital, the customer appears to be merely an empty shell company. ***Shanghai HongYun does not yet have an official phone number, email, WeChat or website that we could find.***

[Image omitted.]

Hyzon cannot claim that HongYun is the subsidiary of a larger corporation because its two sole shareholders are individuals.

* * *

***In our opinion, such evidence suggests that Hyzon announced a bogus deal with a fake looking Chinese customer to pump its stock price.***

## 2. Channel Checks Reveal Next Largest Customer Not Really a Customer; Significant 2021 Delivery and Guidance Miss

***Hyzon's next largest customer is a tiny New Zealand startup who told us they are not really a customer.*** Based on our conversation, we do not think that Hiringa has the obligation, the intention, or the capability to purchase the trucks Hyzon claimed in its announcement.

Hiringa has long been a key customer in Hyzon's SPAC narrative. At the height of SPAC mania in February 2021, Hyzon announced that it had signed an

agreement to build and supply 1,500 hydrogen powered vehicles for Hiringa, with the first batch of 20 trucks "expected to enter service" in 2021.

[Image omitted.]

Hyzon also highlighted the Hiringa contract in a YouTube promotional video by its CEO Craig Knight in March 2021.

[Image and link omitted.]

To channel check Hyzon's claims, we spoke with a senior Hiringa executive. Although they remain interested in the project, *Hiringa explained to us that they are not actually a customer, but a "channel partner" for Hyzon's vehicles*. Hiringa does not intend to pay for or take title over the trucks, but merely facilitate the sale of hydrogen trucks to third parties.

> *"We're effectively a channel partner model if you like."*

> "**Our business model is not to buy the trucks. We do the refueling.... we're effectively an unpaid market channel**"

> *"**There's no point in us being the middleman. So [the end customer] will physically pay for the trucks and they will physically take title.**"*

> - Hiringa Executive

* * *

This makes more sense, as *Hiringa does not have anywhere near the financial resources to pay for 1,500 trucks, being a company with less than 20 employees according to LinkedIn* [link omitted] *and supposedly operating out of a house* [link omitted] *in New Zealand*. Rather than purchasing 1,500 trucks, *Hiringa plans to build fuel stations* with the hope of facilitating future purchases from end customers.

*Hiringa also informed us that the 1,500-truck agreement claimed by Hyzon in its investor presentations is not a binding order, and that it merely represents a right, not an obligation, to buy.*

> *"That's a right to buy, not an obligation to buy."*

> *"At the end of the day it's not binding. **That's not a binding purchase.** It's a purchasing framework."*

> - Hiringa Executive

* * *

*In its investor presentation [of July 2021], Hyzon insisted that these 2021 orders are "100% certain." Not probable, but "100% certain."*

\* \* \*

### 3. Phantom Big-Name Customers Suggest Overstated Orders and Financial Projections

In its much hyped initial investor [link omitted] presentation filed in February 2021, *Hyzon generated considerable buzz around its SPAC with a deck that included a number of big household names listed as "top tier customers," including Coca Cola, Nestle, Ikea, and Heineken.*

[Image omitted.]

For example, the February deck showed that Hyzon was **finalizing** purchase orders with the likes of **Heineken** and **Ikea** for vehicles to be delivered in 2021. Hyzon also projected **hundreds of millions in revenues from Coca-Cola** in the next five years.



*Source: Hyzon Investor Presentation February 2021*

These names generated considerable enthusiasm, and Hyzon's stock price predictably exploded with investor interest. Yet like many other rotten EV SPACs (e.g. Lordstown Motors) [link omitted], these name brand customer relationships appear to have been largely illusory.

15

Two months later, Hyzon's April investor presentation [link omitted] showed a very different customer list with most of the notable name brands missing.



*Source:* Hyzon February 2021 Investor Presentation , Hyzon April 2021 Investor Presentation

**Coca Cola. Gone. Heineken. Gone. Ikea. Gone.**

In the four months between February 2021 and July 2021, nearly all of Hyzon's previously named blue chip customers disappeared from its disclosures altogether. ...

***In total, Hyzon dropped blue chip customers with orders worth $700 million in future orders from its subsequent investor presentations.***

[Image omitted.]

Hyzon achieved early credibility in a crowded field of zero revenue EV SPACs in part by promoting orders from name brand customers, yet without a word it has dropped almost all of these supposed customers from mention in its subsequent investor presentations. ...

Between the top of SPAC mania in February and the lukewarm market conditions in July, multiple EV SPACs were exposed for faking customer orders, exaggerating their backlog and exaggerating future revenues, including XL Fleet, Nikola, and Lordstown Motors [links omitted].

\* \* \*

- **Former Executives Left in Part Because of Concerns over Misrepresentations on Customer Contracts.**

Hyzon's apparent misrepresentation of its key customers at the time of its SPAC is consistent with the comments of one of its former senior executives with whom we spoke. The former executive indicated that he and other early senior Hyzon executives, all of whom left the Company, became uncomfortable with how Hyzon was presenting customer orders to investors.

> *"I just didn't like the way it was being presented. A lot of the stuff that they are saying is open to interpretation how you read that. Saying that they've got all of these orders and things. But a lot of them are **all MoUs which as you know in the business mean basically nothing.***

> *They were going out, kind of selling it as really what it wasn't at the time. **A bit like unfortunately what Nikola was doing. It's kind of a lot of hype, and getting money through that hype from people who don't really understand***

> *You know it's great to show all these pictures of renderings of trucks and orders that you may have, but these orders, **most of them... 90% of them are MoUs so there's no binding contract, and if you look from when they've announced those [contracts], still none of those have been built or delivered.***

> *__The only three vehicles they have is what's on their website. These are all prototype vehicles.__ They're not production vehicles of any type. They've basically been hand built at the facilities. These are the things that I think, if you're going to announce that, say that. Be honest about it.*

> *I was very uncomfortable with that. A lot of these, if you look at their website, they've loaded lots of them on there of signed meetings they had. All these are MoUs that they've signed. **None of them are binding in any way whatsoever**."*

> > - Former Senior Hyzon Executive

... In our opinion, Hyzon was either initially misleading the market or it lost these orders between February and July. Either way, we cannot see a scenario in which Hyzon's revenue projections could remain unchanged.

(Emphasis added.) (Internal footnotes omitted.)

29.     The Blue Orca Report stated the following, in pertinent part, regarding the

Company's delivery schedule and abilities:

**Significant 2021 Delivery and Guidance Miss**. ***According to Hyzon, Hiringa will account for 24% of the Company's projected deliveries in 2021. Yet Hiringa stated point blank that no deliveries would be taken in 2021***, and the first validation trucks would be delivered for testing in *March or April 2022*, at the earliest. ***Hiringa supposedly accounts for 24% of Hyzon's projected 2021 deliveries, so we expect a major guidance miss.*** We think it is highly misleading for Hyzon to continually reaffirm delivery and revenue guidance and characterize such revenues as "100% certain" when Hiringa admits that it will not take any deliveries this year.

\* \* \*

As we will discuss in the next section, interviews with other purported customers indicate that Hyzon is far behind its vehicle delivery claims to investors and will likely miss guidance both in 2021 and going forward by a wide margin. We suspect that given these and other setbacks, Hyzon was desperate.

\* \* \*

**Significant 2021 Delivery and Guidance Miss**

Furthermore, Hiringa directly contradicted Hyzon's claims regarding its near-term deliveries.

***When Hyzon announced the Hiringa contract, it stated that it expected to deliver the first 20 trucks by the end of 2021, accounting for 24% of its guided deliveries in the year.*** As recently as August [link omitted], Hyzon reaffirmed this guidance, projecting 85 truck deliveries and $37 million in revenues in 2021.

\* \* \*

Yet Hiringa's executive said that ***Hiringa will not take any deliveries of Hyzon trucks in 2021 and expects to receive the first four validation vehicles in March or April 2022, at the earliest.***

> *Hiringa: "Realistically with the supply chains, I think they will be arriving in March or April [2022]. There's also some work to do in quarter one in the Netherlands before they ship."*

> *Blue Orca: "So you don't actually expect trucks this year? You expect them in the first quarter of 2022?"*

> *Hiringa: "...**March through May, if you like, or April through June [2022] is when we are going to be doing validation in New Zealand... it's not [a] full commercial operation.**"*

> *Blue Orca: "So you don't expect any trucks to be delivered from Hyzon until at least March or April next year. **And those are the four validation units?"***
>
> *Hiringa: "Yep, yep."*

- Hiringa Executive

This directly contradicts Hyzon's claims to investors. According to Hyzon's disclosures, Hiringa will account for 24% of the Company's deliveries in 2021, making it the key to whether Hyzon meets its revenue and delivery guidance for this year. But ***Hiringa told us point blank that no deliveries would be taken in 2021, and the first validation trucks would be delivered in March or April 2022, at the earliest***.

Furthermore, Hiringa told us that the remaining 16 trucks ordered from Hyzon would be fulfilled based on testing results of the initial four validation vehicles, which they expect to carry out between March and June 2022 at the earliest.

We asked Hiringa if there was any possibility that they might bring forward the order for the 16 trucks, but Hiringa told us that they do not want to take delivery until they build the commercial hydrogen fuel station infrastructure in New Zealand – which Hiringa indicated would not be until the second half of 2022.

> *"We don't have the [commercial] stations until the second half of the [2022] calendar year. So, we don't want to hold [on to] 16 trucks..."*

- Hiringa Executive

Our call with Hiringa suggests that the 1,500-truck deal was more hype than reality. Based on our conversation, we do not think that Hiringa has the obligation, the intention, or the capability to purchase the trucks Hyzon claimed in its announcement.

Ultimately, we think Hyzon continues to mislead investors by reaffirming 2021 guidance when its purportedly major customer is not actually a customer and states point blank that they will not be taking any vehicle deliveries this year.

(Emphasis added.)

30.     On this news, Hyzon shares fell $2.58 per share, or 28%, to close at $6.63 per share on September 28, 2021, damaging investors.

31.     As a result of Defendants' wrongful acts and omissions, and the decline in the market value of the Company's securities, Plaintiff and other Class members have suffered significant losses and damages.

## PLAINTIFF'S CLASS ACTION ALLEGATIONS

32.     Plaintiff brings this action as a class action pursuant to Federal Rule of Civil Procedure 23(a) and (b)(3) on behalf of a Class, consisting of all those who purchased or otherwise acquired the publicly traded securities of Hyzon during the Class Period (the "Class") and were damaged thereby.  Excluded from the Class are Defendants herein, the officers and directors of the Company, at all relevant times, members of their immediate families and their legal representatives, heirs, successors or assigns and any entity in which Defendants have or had a controlling interest.

33.     The members of the Class are so numerous that joinder of all members is impracticable.  Throughout the Class Period, the Company's securities were actively traded on the NASDAQ. While the exact number of Class members is unknown to Plaintiff at this time and can be ascertained only through appropriate discovery, Plaintiff believes that there are hundreds or thousands of members in the proposed Class. Record owners and other members of the Class may be identified from records maintained by the Company or its transfer agent and may be notified of the pendency of this action by mail, using the form of notice similar to that customarily used in securities class actions.

34.     Plaintiff's claims are typical of the claims of the members of the Class as all members of the Class are similarly affected by Defendants' wrongful conduct in violation of federal law that is complained of herein.

35.     Plaintiff will fairly and adequately protect the interests of the members of the Class and has retained counsel competent and experienced in class and securities litigation. Plaintiff has no interests antagonistic to or in conflict with those of the Class.

36.     Common questions of law and fact exist as to all members of the Class and predominate over any questions solely affecting individual members of the Class.   Among the questions of law and fact common to the Class are:

(a)     whether Defendants' acts as alleged violated the federal securities laws;

(b)     whether Defendants' statements to the investing public during the Class Period misrepresented material facts about the financial condition, business, operations, and management of the Company;

(c)     whether Defendants' statements to the investing public during the Class Period omitted material facts necessary to make the statements made, in light of the circumstances under which they were made, not misleading;

(d)     whether the Individual Defendants caused the Company to issue false and misleading SEC filings and public statements during the Class Period;

(e)     whether Defendants acted knowingly or recklessly in issuing false and misleading SEC filings and public statements during the Class Period;

(f)     whether the prices of the Company's securities during the Class Period were artificially inflated because of the Defendants' conduct complained of herein; and

(g)     whether the members of the Class have sustained damages and, if so, what is the proper measure of damages.

37.     A class action is superior to all other available methods for the fair and efficient adjudication of this controversy since joinder of all members is impracticable.   Furthermore, as the damages suffered by individual Class members may be relatively small, the expense and

burden of individual litigation make it impossible for members of the Class to individually redress the wrongs done to them.  There will be no difficulty in the management of this action as a class action.

38.     Plaintiff will rely, in part, upon the presumption of reliance established by the fraud-on-the-market doctrine in that:

(a)     Defendants made public misrepresentations or failed to disclose material facts during the Class Period;

(b)     the omissions and misrepresentations were material;

(c)     the Company's securities are traded in efficient markets;

(d)     the Company's securities were liquid and traded with moderate to heavy volume during the Class Period;

(e)     the Company traded on the NASDAQ, and was covered by market analysts;

(f)     the misrepresentations and omissions alleged would tend to induce a reasonable investor to misjudge the value of the Company's securities;

(g)     Plaintiff and members of the Class purchased and/or sold the Company's securities between the time the Defendants failed to disclose or misrepresented material facts and the time the true facts were disclosed, without knowledge of the omitted or misrepresented facts; and

(h)     Unexpected material news about the Company was rapidly reflected in and incorporated into the Company's stock price during the Class Period.

39.     Based upon the foregoing, Plaintiff and the members of the Class are entitled to a presumption of reliance upon the integrity of the market.

40.     Alternatively, Plaintiff and the members of the Class are entitled to the presumption of reliance established by the Supreme Court in *Affiliated Ute Citizens of the State*

*of Utah v. United States*, 406 U.S. 128, 92 S. Ct. 2430 (1972), as Defendants omitted material information in their Class Period statements in violation of a duty to disclose such information, as detailed above.

## COUNT I
### Violation of Section 10(b) of The Exchange Act and Rule 10b-5
### Against All Defendants

41.     Plaintiff repeats and realleges each and every allegation contained above as if fully set forth herein.

42.     This Count is asserted against the Defendants and is based upon Section 10(b) of the Exchange Act, 15 U.S.C. § 78j(b), and Rule 10b-5 promulgated thereunder by the SEC.

43.     During the Class Period, the Defendants, individually and in concert, directly or indirectly, disseminated or approved the false statements specified above, which they knew or deliberately disregarded were misleading in that they contained misrepresentations and failed to disclose material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading.

44.     The Defendants violated §10(b) of the 1934 Act and Rule 10b-5 in that they: employed devices, schemes and artifices to defraud; made untrue statements of material facts or omitted to state material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading; and/or engaged in acts, practices and a course of business that operated as a fraud or deceit upon Plaintiff and others similarly situated in connection with their purchases of the Company's securities during the Class Period.

45.     The Defendants acted with scienter in that they knew that the public documents and statements issued or disseminated in the name of the Company were materially false and misleading; knew that such statements or documents would be issued or disseminated to the investing public; and knowingly and substantially participated, or acquiesced in the issuance or

dissemination of such statements or documents as primary violations of the securities laws. These defendants by virtue of their receipt of information reflecting the true facts of the Company, their control over, and/or receipt and/or modification of the Company's allegedly materially misleading statements, and/or their associations with the Company which made them privy to confidential proprietary information concerning the Company, participated in the fraudulent scheme alleged herein.

46.     The Individual Defendants, who are senior officers and/or directors of the Company, had actual knowledge of the material omissions and/or the falsity of the material statements set forth above, and intended to deceive Plaintiff and the other members of the Class, or, in the alternative, acted with reckless disregard for the truth when they failed to ascertain and disclose the true facts in the statements made by them or other personnel of the Company to members of the investing public, including Plaintiff and the Class.

47.     As a result of the foregoing, the market price of the Company's securities was artificially inflated during the Class Period.  In ignorance of the falsity of the Defendants' statements, Plaintiff and the other members of the Class relied on the statements described above and/or the integrity of the market price of the Company's securities during the Class Period in purchasing the Company's securities at prices that were artificially inflated as a result of the Defendants' false and misleading statements.

48.     Had Plaintiff and the other members of the Class been aware that the market price of the Company's securities had been artificially and falsely inflated by the Defendants' misleading statements and by the material adverse information which the Defendants did not disclose, they would not have purchased the Company's securities at the artificially inflated prices that they did, or at all.

49.     As a result of the wrongful conduct alleged herein, Plaintiff and other members of the Class have suffered damages in an amount to be established at trial.

50.     By reason of the foregoing, the Defendants have violated Section 10(b) of the 1934 Act and Rule 10b-5 promulgated thereunder and are liable to the Plaintiff and the other members of the Class for substantial damages which they suffered in connection with their purchases of the Company's securities during the Class Period.

**COUNT II**
**Violation of Section 20(a) of the Exchange Act**
**Against the Individual Defendants**

51.     Plaintiff repeats and realleges each and every allegation contained in the foregoing paragraphs as if fully set forth herein.

52.     During the Class Period, the Individual Defendants participated in the operation and management of the Company, and conducted and participated, directly and indirectly, in the conduct of the Company's business affairs.  Because of their senior positions, they knew the adverse non-public information regarding the Company's business practices.

53.     As an officers and/or directors of a publicly owned company, the Individual Defendants had a duty to disseminate accurate and truthful information with respect to the Company's financial condition and results of operations, and to correct promptly any public statements issued by the Company which had become materially false or misleading.

54.     Because of their positions of control and authority as senior officers, the Individual Defendants were able to, and did, control the contents of the various reports, press releases and public filings which the Company disseminated in the marketplace during the Class Period.  Throughout the Class Period, the Individual Defendants exercised their power and authority to cause the Company to engage in the wrongful acts complained of herein.  The Individual Defendants, therefore, were "controlling persons" of the Company within the meaning

of Section20(a) of the Exchange Act.  In this capacity, they participated in the unlawful conduct alleged which artificially inflated the market price of the Company's securities.

55.    The Individual Defendants, therefore, acted as controlling persons of the Company.  By reason of their senior management positions of the Company, the Individual Defendants had the power to direct the actions of, and exercised the same to cause, the Company to engage in the unlawful acts and conduct complained of herein. The Individual Defendants exercised control over the general operations of the Company and possessed the power to control the specific activities which comprise the primary violations about which Plaintiff and the other members of the Class complain.

56.    By reason of the above conduct, the Individual Defendants are liable pursuant to Section 20(a) of the Exchange Act for the violations committed by the Company.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff demands judgment against Defendants as follows:

A.    Determining that the instant action may be maintained as a class action under Rule 23 of the Federal Rules of Civil Procedure, and certifying Plaintiff as the Class representative;

B.    Requiring Defendants to pay damages sustained by Plaintiff and the Class by reason of the acts and transactions alleged herein;

C.    Awarding Plaintiff and the other members of the Class prejudgment and post-judgment interest, as well as their reasonable attorneys' fees, expert fees and other costs; and

D.    Awarding such other and further relief as this Court may deem just and proper.

## DEMAND FOR TRIAL BY JURY

Plaintiff hereby demands a trial by jury.

Dated:  October 13, 2021

Respectfully submitted,

POMERANTZ LLP

*/s/ J. Alexander Hood II*
J. Alexander Hood II
Jeremy A. Lieberman
(*pro hac vice* application forthcoming)
600 Third Avenue
New York, New York 10016
Telephone: (212) 661-1100
Facsimile: (212) 661-8665
ahood@pomlaw.com
jalieberman@pomlaw.com

BRONSTEIN, GEWIRTZ &
GROSSMAN, LLC
Peretz Bronstein
(*pro hac vice* application forthcoming)
60 East 42nd Street, Suite 4600
New York, New York 10165
Telephone: (212) 697-6484
Facsimile: (212) 697-7296
peretz@bgandg.com

*Attorneys for Plaintiff*

Tuesday, October 5, 2021

# Hyzon (HYZN)

## CERTIFICATION PURSUANT TO FEDERAL SECURITIES LAWS

1.  I make this declaration pursuant to Section 27(a)(2) of the Securities Act of 1933 ("Securities Act") and/or Section 21D(a)(2) of the Securities Exchange Act of 1934 ("Exchange Act") as amended by the Private Securities Litigation Reform Act of 1995.

2. I have reviewed a Complaint against Hyzon Motors Inc. f/k/a Decarbonization Plus Acquisition Corporation ("Hyzon" or the "Company") and authorize the filing of a comparable complaint on my behalf.

3.  I did not purchase or acquire Hyzon securities at the direction of plaintiffs counsel, or in order to participate in any private action arising under the Securities Act or Exchange Act.

4.   I am willing to serve as a representative party on behalf of a Class of investors who purchased or acquired Hyzon securities during the class period, including providing testimony at deposition and trial, if necessary.  I understand that the Court has the authority to select the most adequate lead plaintiff in this action.

5.  The attached sheet lists all of my transactions in Hyzon securities during the Class Period as specified in the Complaint.

6.   During the three-year period preceding the date on which this Certification is signed, I have not sought to serve as a representative party on behalf of a class under the federal securities laws.

7.   I agree not to accept any payment for serving as a representative party on behalf of the class as set forth in the Complaint, beyond my pro rata share of any recovery, except such reasonable costs and expenses directly relating to the representation of the class as ordered or approved by the Court.

8.   I declare under penalty of perjury that the foregoing is true and correct.

**Name**

**Print Name**

Mark Brennan

**Signature**

redacted

1

**Hyzon Motors Inc. f/k/a Decarbonization
Plus Acquisition Corporation (HYZN)**                              **Brennan, Mark**

### List of Purchases and Sales

| Transaction Type | Date | Number of Shares/Unit | Price Per Share/Unit |
|---|---|---|---|
| Purchase | 7/19/2021 | 31 | $9.7300 |
| Purchase | 7/19/2021 | 589 | $9.7000 |
| Purchase | 7/26/2021 | 10 | $8.0100 |
| Purchase | 9/2/2021 | 400 | $10.0300 |
| Purchase | 9/9/2021 | 10 | $10.7900 |
| Purchase | 9/16/2021 | 109 | $10.3200 |
| Purchase | 9/17/2021 | 2 | $10.5100 |
| Purchase | 9/17/2021 | 1 | $10.4700 |
| Sale | 8/23/2021 | (130) | $8.1500 |
| Sale | 8/27/2021 | (150) | $8.6500 |
| Sale | 8/27/2021 | (150) | $9.0100 |